Good morning, Your Honors. May it please the Court. My name is Myra Monson, and I'm a court-appointed appellate attorney for the defendant, Appellant Ignatia Herrera. Mr. Herrera was convicted of possession with intent to distribute methamphetamine on two counts. There's four issues before the Court this morning, a challenge to the denial of the motion to withdraw his guilty plea, a challenge to the validity of the guilty plea. The client clearly made some bad decisions along the way. He admits that, Your Honor. He admits that he was responsible for his involvement in this. That's part of an entrapment defense as well. He doesn't hold back that. He had a plea bargain which he walked away from. He didn't walk away from it. He felt very confused about that plea agreement. It was handed to him past the prior the day after it was expired. He felt that he only had an hour to talk about that plea agreement. And even in his change of plea hearing, he addresses the Court about his confusion about the plea. He says that he feels that he screwed up in his words. He was unclear about it. But the government extended the offer for 60 days, right? That's what the government offered, but it's the defendant's position that he only saw that plea agreement after it was expired. How far into the extension, I don't know. And that was part of the confusion and part of his mistrust of his first defendant of his first attorney, which is also a claim here of ineffective assistance of counsel, as well as a Rule 32 error. Are you basing your claim on walking away from the offer? Is part of the claim of ineffective assistance that counsel did not adequately inform him about the terms and duration of the plea offer? That's part of our ---- I don't really see that. I don't believe. Only in the sense that that brings up a level of mistrust. But really our claim of ineffective assistance of counsel is that he wasn't adequately advised in order to make a knowledgeable guilty plea. Hard to resolve that on direct appeal, though, isn't it? Hard to resolve that. But we feel the record is very clear here. There was a lot of just investigation into the relationship between his ---- The government thinks the record is clear, too, and it cuts against you. Excuse me? The government thinks the record is clear, too, but it cuts the other way. It's cleared the other way. Regarding the ineffective counsel? They feel that the first counsel was effective, but she admittedly, at the change of plea hearing, admitted she didn't listen to all the discovery. She signed declarations that she didn't ---- What is that? What is there to listen to? She knew the story. She talked to your client, knew about the sister, thought that that wouldn't come near justifying an entrapment defense, and I can't blame her. I don't think it could come anywhere near justifying an entrapment defense. That's how informants get under your skin. They do little things for you, this and that, and then they help you out, and then they entrap you. That's how it works. I mean, informants. And then they get you to gain your confidence, and they get you to do a drug deal. But the fact that he did this doesn't come anywhere close to establishing an entrapment defense. First of all, we feel that this particular informant, and the records clear on that, did more than just a little bit to win his friendship. We feel that he created a debt obligation. That was not ---- He knows the story. The lawyer doesn't need to listen to the tape to find out about this. This is not some hidden fact that the lawyer, oh, my God, goes, finds out, and the defendant doesn't know about it, you know, like the police are suppressing records or suppressing interviews with exculpatory witnesses that nobody knows about. All of this is stuff that your client knows about, talks to his lawyer about. A lawyer knows what his version of the facts is and makes a judgment that this is not enough, not near enough, even if proven, even if you had the bishops come in and swear to it, it's not enough to establish an entrapment defense. What's wrong with that? What's incompetent about that? I think what's wrong about that is that she didn't investigate any of the client's version of the defense, version of the events. She must decide even if everything he says is absolutely true and I could get completely credible witnesses to come in and testify to it in court, it would not help. But that actually, that's not the standard for when he would go to move to withdraw his claim. Let's say I'm convinced that it wouldn't help. What's the foul there? Well, I think the second attorney felt that he could make that defense for him, could not go proceed to trial on the evidence that his first attorney didn't investigate. How? How does the fact, I mean, do you know the elements of entrapment? If there's somebody who's not predisposed and who's then induced to commit, you know, this guy's found with a bunch of, you know, he's set up this deal with these agents and then he's got more drugs in his own car. This is not somebody that, I mean, there's no evidence at all that he was goaded into doing something. He says, no, no, no, I don't want to lead a life of crime. And then they say, oh, but you owe me a big favor. You go out and get. There's no evidence like that on the record, not his story, not anything else. We believe that the evidence about the prior relationship with the confidential informant was more than just a little bit of involvement. It was undue influence to the point that he was toying with this defendant who admittedly had six children, was under financial distress, and was looking – was involved with this individual on a cash basis to make some money and then got a proposition to sell some drugs, and he felt that he had a debt obligation  – he had set up his – brought his girlfriend across, smuggled his girlfriend, had brought him food, paid him some money. This was a debt obligation. It wasn't without – that he – there was no reason for him to get involved. But it sounds to me like he just sounds like the guy. I'm going to do a drug business. Who am I going to sell the drugs to? I'll sell it to a guy who's done all these other illegal things for me, so he's not likely to turn me in. It doesn't sound to me like your client was induced into committing a crime he wouldn't otherwise commit. This is much more like the cases where somebody is perfectly willing and ready to commit a crime, and the police informant then comes along and provides an opportunity for doing what the defendant was going to do anyway. Well, the position is, Your Honor, that – Was there any evidence that the guy was – that the informant said, look, I really need drugs badly. You go out and get it for me. He said, no, no, no, I can't do that. It's illegal. And the informant sort of kept pushing on. Any evidence like that? Well, the evidence is that – from our position is that the drug informant approached my client and befriended him. When he actually propositioned him to make drugs, I don't know how the drug – the confidential informant – Any evidence of inducement? Excuse me? Inducement? There is inducement here, Your Honor. There's inducement about the cash for cardboard, giving him gifts of television sets, smuggling his girlfriend across the border. But any evidence of those things were tied to saying, look, I'll smuggle your girlfriend across the border if you'll sell drugs, and any – any evidence, even from your own client, that says that these things were done as an inducement to – to say – to overcome his reluctance to commit crime? That's what you need for entrapment. I believe that there's sufficient evidence to go to a jury on this, Your Honor, because the confidential informant was overbearing in the sense of his involvement with my client prior to the drug – the transactions even coming into play, prior to the scope of the indictment. There was like a five-month involvement from – I'm sorry, like a six-month involvement with my client to get him involved. He had never had any experience with drugs. He never had any – done any illegal activity. He was in the Marines. He was a law-abiding citizen. He came upon some financial problems. I can see the – But where no one ever does drugs? Is that what you're saying? Excuse me? In the Marines where no one ever does drugs? I said he never dealt with drugs. Okay. There was no dealings with drugs. There was no involvement as – with intent to distribute drugs. And there's no indication that he ever did drugs himself. And it's our position that on the denial of the motion to withdraw his guilty plea, the standard was too high. In fact, the standard was exactly what you were saying, that he – all this evidence wouldn't win him an entrapment offense. But that's not the standard for a demotion to deny. The standard for a demotion denial is a fair and just reason. And he's presented four areas where there's a fair and just reason. He knew about all of these things before he took his guilty plea. There's nothing new that came along. There's no new evidence. There's no new theory. Nothing dropped out of the sky. I don't see what this is. Tape number four, which was never reviewed, never transcribed. What number four? Tape number four has to do with the evidence of this being smuggled across the country into the United States. But you're correct. But the United States trustee – It's not even a new tape. The lawyer had the tape. The lawyer did not review it, did not transcribe it, admittedly wrote a declaration about that. And it was not in her advisement. But he knew about the girl being – the girl being smuggled across the border. He knew about it. United States Garcia, which was – which I – He knew about it. He knew – he knew that there was discussions in the tapes. During the time of the scope of the indictment, there was discussions about having brought his girlfriend across and the confidential informant saying, see, we did this for you. You have to do something for us. But United States Garcia says that the new evidence can be bolstering evidence, corroborating evidence, and supporting evidence, which this is. And it would clearly support his position that he had a debt obligation. And the confidential informant said, we did something for you. Now you have to do something for us. And we feel that that's enough, that the district court applied the wrong standards. It should be liberally – wrong standards to deny his motion. I am not understanding what you're saying. When you say you did something – we did something for you, now you do something for us. Is that a quote from someplace? That's tape number – I believe it's tape number one, number seven. And there was three tapes. If he looked at the tape, it actually had that quote. Yes. There's a tape. From the informant? Yes, Your Honor. It's in our evidence. It's in our appellate's excerpts of record. Where? It's I think you're tab number six. I'm there. I'm sorry. Which page? Yes. It's tab number six. It's number one. It's N1. It's the tape. Which page on that? On page what? I'm sorry, Your Honor. I have it tabbed. So it's the first page. Well, I understand. It's the first page. It's the first – it's tape N1. It's the first page on tab six. Okay. There's a number at the bottom of the page. Is that a one? It's not numbered, but it says one. Sorry? It says one at the bottom of the page. You don't think that's a number? That's the number. Do you think that's the letter? That's the letter. Okay. That's the number. Okay. So where on that page are you reading? I'm sorry. It's either – it's number N1 in conjunction with – in conjunction. Well, there are a lot of words on one, page one. Yes. Okay. I'm trying to get an idea of where on the page you are pointing me to. I'm pointing to page one and also page five. It's in conjunction with N1 and N7. Okay. So the pages are big things. There are a lot of words on them. Can you be a little more specific where on page one? Well – Like bottom half or top half of the page? We're talking – What is sort of on the left-hand side? He's talking – on one, he's talking here, what happened to your sister. Tell him I'm already called. Well, you should tell me. My people – This – Where are you reading from? The second paragraph – the third paragraph on the bottom, the three paragraphs, and then if you turn to page five. Is this the one that says, oh, nothing much? Yes. Start at the top. What happened with his sister, which – because the sister was housing the girlfriend in Mexico before she brought. And then if you turn to – in conjunction with tape N7. Before we go to the other page, what is it here? Why don't you read to me the part here? Okay. Nacho, who is also Mr. Herrera, what happened, Tony, with that person with his sister? Oh, nothing much. I've already called for that. They didn't let me. The first time that my people were at, quickly they threw them back. He's talking about smuggling. Hey, if you were still – were still interested in doing business. And then if you turn to – and then tape N4, which is talking about bringing his girlfriend across. I'm sorry. I'm sorry. This is – Moving across the pages. You turn the page to page two. That's N4, which was not listened to by the first attorney, not transcribed, not reviewed. And then if you turn to page five. No, no, no, no. I want to leave page N4. What is it on page N4 that you find significant? Well, the whole – the whole conversation has to do with bringing his pregnant girlfriend across to the United States and talking about having – Instead of talking about bringing the girlfriend over, I want the part that says – If you turn – in conjunction, if you turn to N7 on page five. N7 on page five. Yeah. Right. I mean, remember when you told me to help you out? Right. Oh, yeah. Well, then – You're doing it again. You're not telling me where you're going. Okay. Oh, I see. This is here. Three paragraphs on the bottom. Right. I mean, when you – I mean, you remember when you told me to – told me – me to help you out? Right. Yeah. Okay. Well, then, you too. I want you not to let me down. I want you to do right by me. Well, N7 was transcribed, right? Seven was transcribed. And one was transcribed? Excuse me? And one was transcribed. One was transcribed. So the material you just read to Judge Kaczynski was before the defense counsel at the time. She was looking for – number one, but she was looking for evidence to support his version that there was – about corroborating, about smuggling the girlfriend across. She could not get – she said that she did not interview the girlfriend because Mr. Herrera did not want him to be a witness. But that shouldn't have been a deterrent to her at least investigating and backing up what Mr. Herrera said. And admittedly, she said in her declaration they were looking for corroborating evidence about his version of the events. This would have been corroborating evidence. Right, but that's – that wasn't new. Excuse me? It wasn't new at the time of the motion. It was new at the time of the motion. No, this had already been transcribed, right? No, it was not transcribed, number seven. Number four was not transcribed. I know number four wasn't, but you're talking about number one and number seven. Number one and number seven was, but the new evidence – At what point in time? First counsel knew about what was said. Right, so the only thing new was number four. Correct. But that's not what you were talking about with – Yes, you – yes. You were talking about – What are the four that – The debt obligations that were set up because he smuggled the girlfriend. That's what we were talking about with Judge Kaczynski. Right, but I thought the citations were to N1 and N7 in the record that you were just talking about. NN4. That's – he asked what new evidence was there. I mean, you remember when he told me to help you out, right? Yes. So the place that sets up this, you know, I helped you, you helped me, is on seven, which is – It starts out at one, it moves through four, it ends at seven, and you get the whole picture. Right, but the only missing link is what I'm saying is N4. That's the only thing that was new. Correct. Okay. Which – but new to the point that that's what counsel, the first counsel, was looking for. She admits this in her declaration, which is filed in the record. She was looking for evidence to corroborate his version that they brought the girlfriend across. And this defense counsel admits, first defense counsel admits she didn't review all the tapes, admits she relied on conclusions from her translator. I don't know what she means by conclusions. She should have been relying on her translator's translations. So she admits that she didn't review all the discovery. And that's our basis for saying she could not have advised Mr. Herrera with all competence not to accept a guilty plea. Thank you, Your Honor. May it please the Court, Demian Martinez for the United States. This is an unfortunate case in all honesty. And at this point and at all the points since the defendant hired new counsel, if there really were a chance for the defendant to prevail at trial, the government would have agreed to the withdrawal of the guilty plea. But I think, Your Honors, that we need to go no further than paragraph 45C of the PSR, in which the defendant tells the probation officer that he first became introduced to the informants when his friend Enrique put them together. And when the probation officer asked the defendant why did this introduction occur, the defendant said, well, Enrique knew I was trying to get into the narcotics business. And as Your Honors are fully aware, the entrapment defense requires two prongs, and both of them are necessities. And one of those is a predisposition. And it appears in the government's disinterested conclusion, in Judge Anderson's conclusion, that this defendant was predisposed to commit the crimes he did. And when one considers kind of an amorphous fair and justice standard, it seems that a reversal, sending this back down in a trial, will not result in a better sentence for this defendant. He'll likely result in a worse situation than he is in now. And it's unfortunate, but it doesn't seem like there's any alternative. The defendant was presented an opportunity to receive a better sentence. The government left that off. Why do you think he'll receive a greater sentence on remand? Well, it's possible that if he were to go to trial, he would not. Assuming that Judge Anderson decides to follow the guidelines, he could get the three points for acceptance would be taken away. If he testified, he could theoretically receive a two-level enhancement for obstruction of justice if he decides to contradict some of the statements that are plainly in the record that indicate that he was not entrapped within the legal sense of the word. I wanted to point out one quick thing that Ms. Mossman mentioned. She said that the defendant had no history of narcotics use. Paragraphs 90 and 91 of the PSR indicate that the defendant was using narcotics, including marijuana, cocaine, and methamphetamine, after he was introduced to the informants, and he never ascribed that as a result of the informant's conduct. He said that he just needed to use the drugs to maintain his busy work schedule. What was the deal that he was offered? The government offered the defendant a pre-indictment plea offer of an 18 U.S.C. 371, a conspiracy charge, which has a statutory maximum sentence of 60 months in prison. So what we did, and this was all pre-Booker, pre-Blakely, was... What did he get? 108 months' sentence. So, Your Honors, the government comes back to the point that this particular defendant... And if the lawyer muffed that offer, that might well be an effective depression, an effective assistance claim. That issue was litigated... That, to me, rings far more true than this whole thing about the tape and the crap and all that stuff, which I don't think amounts to much. But if the lawyer doesn't make it clear what the deal is or how long it's open or, you know, when it expires, that or how good the deal is, which under the circumstances, this was quite a sweetheart deal, I'm... I understand, Your Honor. I'm not sure the plan is here before us, but it's sort of lurking. I guess there's two responses to that. And the first is, yes, that this is not – that's not part of the appeal. And the second response is that this issue was litigated very fully at the district court, and I attached in my motion notes taken by the public defender indicating that she visited this defendant a number of times, over and over and over again, to discuss this deal. And at the end of the day, the public defender sent me a letter saying he just does not want to take the deal because he wants an opportunity to further argue downward departures below the five-year sentence. My own – you know, I've been involved in this case from before I was indicted, and I had a lot of conversations. And this is outside the record, but I think it will be okay if I quickly just go into this, which is that she just simply could not convince him of the deal. It was the first deal that came in, you know, immediately after he was arrested, and he assumed that eventually he would get a better deal than this one. And... Well, now it's such a softie that I didn't re-offer the deal after the indictment. But isn't that a question for habeas? Why do you think we can reach that on direct appeal? I'm sorry. Do you think we can reach that issue on direct appeal? I think it's awfully difficult to conclude one way or the other what happened between client and attorney on direct appeal. I agree, Your Honor. You know, if this were... You're giving us a preview of the 2255. That's true of the habeas claim, or the habeas claim based on what advice he got as to the plea bargain. But it's not necessarily... I mean, that is not connected necessarily with the claim that opposing counsel is arguing here, which has to do with whether or not there was competent counsel with respect to doing an investigation about the entrapment and transcribing tapes and all that. And we could very well say that that one is properly presented to us and leave the advice of counsel on the offer for habeas. The two are not... I entirely agree. And the reason why I even mention it is just to give a fuller picture to the court. But that appears, in my judgment, to be an argument litigated for another day. What about this claim about the tape and not listening to the tapes and the entrapment and all that? Counsel cited a case that was decided by this court in March, U.S. v. Garcia. And, frankly, I believe this case is actually stronger for the government because it involved the discovery of a witness the defendant had no idea about. And this witness not only provided some exculpatory evidence, but also had some evidence that would be jiggly-oh against one of the government witnesses. And, you know, that case is smartly different because, in this case, the defendant knew all the facts. Entrapment cases involved defenses in which the defendants weren't necessarily aware of these exculpatory facts. The government produced the tapes. The tapes were available to counsel and to the defendant. And the defendant was aware that the conversations that he had with the informants were recorded. And knowing all these facts, because there was no newly identified evidence, he went in without the benefit of knowing there was entrapment, decided to go ahead and plead. And I don't think that there's a fair and just reason on that basis for him to now withdraw his guilty plea. In addition, if you look at the recordings, there is no obvious example of inducement. I didn't see it. You do this for us because we got this for you, and now you have to go and get us drugs. There is nothing like that in the record to indicate that. So, you know, even this were newly identified evidence, I think it would only be strong if the defendant's girlfriend had testified and he repeatedly declined to make her available. Only that would have given no context to how these ambiguous discussions about immigration or possibly the defendant's girlfriend would have mattered in this case. If there are no further questions, I quickly want to address the rule of thumb. I think the best out of tape four is this. Look, Nacho, we're going to tell them they're going to bring the girlfriend over. And he wants my son more over in the United States. And they say, look, Nacho, we're going to do the thank yous here because we want for now. And he says, oh, yeah. So then you're eager to help. So that well, so that you're eager to help us so that everything comes out all right. That's fine. It seems to me that's the strongest that she has on tape four. Well, I would agree that that is the strongest. And my response would be, first, there's still the predisposition hurdle to get over that seems very insurmountable in the government's judgment. Second is that you still don't have a clear example of inducement even with that best evidence. So putting that all together without the defendant's girlfriend, it's very unlikely the defendant could succeed in trial. And as I pointed out before, unsuccessful trial would result in likely a worse sentence for the defendant. If you look at the record, Judge Anderson considered these offenses serious. He declined to depart downward. He, although gave the defendant the low end, there were some justifications for considering a lower sentence, and he declined. Drugs were a significant amount. They were high in purity. And the defendant, throughout the course of the proceedings, from July to March, he constantly boasted about his ability to satisfy the defendant, the informants at a high level, quantity, 50 pounds at one point, he says, 20 pounds at another. He gave the informants the impression that he was connected to a serious source and never tried to dissuade them of that. And when he wrote out a confession at the time of his arrest in March of 2003, he repeatedly said there, no one forced me to do it, and I kept looking for a source out of my own will. And that's in the record, and I'm quoting from it. And, Amelie, do you mind? Your Honor, in this case, the error, to the extent there is one, under the plain error analysis is a nonconstitutional error. So why don't we remand anyway? It's hard. Amelie didn't distinguish between constitutional and nonconstitutional errors, it seems to me. I realize the underlying case, Booker did, but. First, Your Honor, if you are considering a remand in light of Amelie, the government would like an opportunity to supplement some briefing on this issue. Secondly, the Tenth Circuit has analyzed this issue, I think persuasively, which is that originally under Amelie, this would not have presented a problem under Judge Piazza's decision. And it's only that the government, the Supreme Court created a sweeping remedy that made this case fall within it. The government's position is the defendant shouldn't benefit from the windfall that was created by the Supreme Court. And finally, under the fourth prong of the plain error analysis, the integrity of the judicial system, Skylines has been in existence for a number of years, and it does not seem that this case there was any kind of violation of the integrity of the judicial system to warrant a remand. No, I think the argument is that in cases of downward departure, if the district court were truly, truly had unfettered discretion rather than doing the analysis that we required, that the result might be different. I believe that's the third prong of the plain error analysis. I understand the Court's position that remand may be appropriate, but the government submits that in this case there was no violation of the judicial integrity to warrant a remand. But we would like an opportunity to supplement the briefing if the Court would like. What would you say? We've got an in-bank? I would cite some cases in particular, and perhaps by the time the briefing was completed, there may have been another decision that the Court, the government can cite to this Court. There may not be one in your favor, though. If there's no further questions, thank you, Your Honor. Thank you. Okay. Are you willing to take a minute for a bundle? I just want to say something about what the government said about predisposition. They're relying on some sort of interview that happened, but the only way where that interview appears is in the pre-sentence report. I had no way of verifying if this actually was said. It's not in the record. And that's the only place that the government can rely on, that Mr. Herrera was predisposed. And just in regards to any potential remand under Booker, he'd have an opportunity to ask these downward to get these downward departures and not have to prove them to an exceptional degree. Also, he'd have the benefit of 355A. He could look at his family ties and his family ties and responsibilities affect on his children. And so I think there might be a distinguishing sentence here. And remand might be appropriate because the district court would have an opportunity to take in other factors which he wasn't allowed to take in under the same decision. Yeah. Always risky, though, because it could impose more time. Excuse me? Always risky because the district court could impose more time. I'm not sure if you can under Booker. I think there's case law out there that you can't go upward. Yeah, he says resentence. If you go up, if you go down, you can go up. Where are the sentencing ranges in the district judge sentence here? Excuse me, Your Honor? Where in the range is the district judge sentence? What was the range? Where within the range. He went 108 months. He could go down further because he gave him the safety valve. He's not bound by the mandatory minimum.  I mean, but on remand he could get the mandate. Where within the range, the applicable guidelines range, did the district judge sentence him? In the middle? He gave the lowest end of the range. He gave him 108. 108 was the lowest. Well, it was beyond the mandatory underneath the mandatory minimum, which is 120. So he applied the safety valve. Sure. And you could take that away on remand. And in our position, he didn't even consider any of the other departures. He didn't rule on it. That's our Rule 32 argument. He didn't rule on these departures. These would be available to Mr. Herrera under an advisory position rather than having to prove it an exceptional. Well, it doesn't sound to me like you have much of a risk that he'll go up. But he could. He could. Thank you. Well, he could.  Thank you, sir. You will stand for a minute.
judges: Lay, Kozinski, Thomas